**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| **CONSTRUCTIONSOUTH, INC.** | * | **CIVIL ACTION** |
| | * | |
| **VERSUS** | * | **NO. 12-1258** |
| | * | |
| **FIRE WINDOWS & DOORS, INC., ET AL.** | * | **SECTION "L"(4)** |

## ORDER & REASONS

Before the Court are three motions for summary judgment filed by Defendants. (Rec. Docs. 35, 36, 38). The Court has reviewed the briefs and the applicable law, and now issues this Order and Reasons.

## I.    BACKGROUND

This case arises out of the construction of a five-story apartment building on St. Charles Avenue. Plaintiff ConstructionSouth, Inc. ("CSI") acted as the general contractor for the construction of the building. Defendant Fire Windows & Doors, formerly known as MMS Fire Windows & Doors, Inc. ("Fire Windows"), supplied the window systems, which CSI now alleges are defective. CSI is currently involved in an arbitration proceeding involving the owner of the building and other parties, and seeks contribution from Fire Windows and its alleged insurers, Defendants First Specialty Insurance Corporation ("First Specialty") and Scottsdale Insurance Company ("Scottsdale"), for any damages claimed in the arbitration proceedings.

CSI filed suit in Civil District Court for the Parish of Orleans on November 10, 2011. (Rec. Doc. 1-1 at 1). On April 13, 2012, CSI amended its Petition for Damages, adding First Specialty as a defendant. *Id.* at 17-19. Shortly thereafter, First Specialty removed the case to this Court. (Rec. Doc. 1). On April 18, 2013, the Court granted CSI leave to file a Second

Supplemental and Amending Petition (Rec. Doc. 28), which added Scottsdale to the case.

The uncontested facts are as follows. In September 2001, CSI entered into a contract with The Welcome Center Building, L.L.C. for the construction of a new five-story building located at 2020 St. Charles Avenue in New Orleans. (Rec. Doc. 35-2 at ¶ 2). CSI was the general contractor for the building, which would eventually house the New Orleans Convention and Visitors Bureau. *Id.* at ¶¶ 1-3. CSI hired various subcontractors to perform work on the building, although CSI and Defendants dispute whether Fire Windows was a subcontractor or a material supplier. *Id.* at ¶ 4. Additionally, CSI and Defendants dispute various facts surrounding Fire Windows' manufacturing and supplying of the windows—primarily, the extent to which Fire Windows custom designed the windows for CSI. *Id.* at ¶¶ 5-8, 9-12. Fire Windows' window systems received final approval in or about April 2002, *id.* at ¶ 9, and they were installed in 2003 at the latest, *id.* at ¶ 13. As described above, CSI now claims that the windows allowed water intrusion or were otherwise defective, and that as a result of these alleged defects, CSI became involved in an arbitration proceeding with the owner of the building and other parties. *Id.* at ¶¶ 21-22. These proceedings remained pending as of December 1, 2011. *Id.* at ¶ 24.

## II.   PRESENT MOTIONS

Defendants Fire Windows, First Specialty, and Scottsdale move for summary judgment against CSI. (Rec. Docs. 35, 36, 38). They argue that Fire Windows' contract with CSI was a construction contract, and therefore, the five-year peremptive period set forth in La. Rev. Stat. § 9:2772 applies. Because CSI filed suit against Defendants on November 10, 2011, and the windows provided by Fire Windows were installed no later than 2003, Defendants argue that CSI's claims are perempted. CSI opposes the motions (Rec. Docs. 41, 42, 43) and argues that

§ 9:2772 does not apply because Fire Windows was a materials supplier rather than a subcontractor, and therefore the contract between CSI and Fire Windows was a contract of sale. CSI also argues that genuine issues of material fact remain with respect to the nature of CSI and Fire Windows' relationship, such that a grant of summary judgment is not appropriate at this time.

## III.  LAW & ANALYSIS

### A.  Standard on Motions for Summary Judgment

Summary judgment is appropriate if the moving party can show "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). When the moving party has met its Rule 56(c) burden, the nonmovant cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. *See Prejean v. Foster*, 227 F.3d 504, 508 (5th Cir. 2000). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). Furthermore, "[t]he non-movant cannot avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994)). In deciding a summary judgment motion, the court reviews the facts drawing all reasonable inferences in the light most favorable

3

to the nonmovant. *Id*. at 255.

**B.     Analysis**

Louisiana law provides for a five-year peremptive period for cases arising out of

construction contracts:

> [N]o action . . . including but not limited to an action for failure to
> warn, to recover on a contract, or to recover damages, or otherwise
> arising out of an engagement of planning, construction, design, or
> building immovable or movable property . . . shall be brought . . .
> against any person performing or furnishing the design, planning,
> supervision, inspection, or observation of construction or the
> construction of immovables, or improvement to immovable
> property . . . .
>
> > (1) (a) More than five years after the date of registry in the
> > mortgage office of acceptance of the work by owner.
> >
> > (b) If no such acceptance is recorded within six months
> > from the date the owner has occupied or taken possession
> > of the improvement, in whole or in part, more than five
> > years after the improvement has been thus occupied by the
> > owner.

La. Rev. Stat. § 9:2772(A).[1]

To receive the benefit of this statute, Defendants must establish (1) that more than five

years have elapsed since the owner recorded acceptance of the work, or that more than five years

and six months have elapsed since the owner took possession of the building; (2) that Fire

---

[1] In opposition to Defendants' motions, CSI argues that a genuine issue of material fact
remains with respect to whether the five-year peremptive period applies, because the current version
of § 9:2772 went into effect on August 15, 2003, and under the prior version of the statute, the
peremptive period was seven years. However, Defendants persuasively argue that although the
peremptive period began when the owner began to occupy the building, CSI's cause of action for
indemnity and/or contribution "was not vested when the 2003 amendment . . . became effective,"
and therefore, the five-year peremptive period applies. *Ebinger v. Venus Const. Corp.*, 2010-2516
(La. 7/1/11), 65 So.3d 1279, 1288.

Windows manufactured the window systems pursuant to a construction contract, as opposed to a sales contract; and (3) that the windows are either immovable property or an improvement thereto. *Swope v. Columbian Chemicals Co.*, 281 F.3d 185, 201 (5th Cir. 2002); *Summerfield v. Harnischfeger Industries, Inc.*, 1998 WL 726080, *2 (E.D. La.1998); *Poree v. Elite Elevator Services, Inc.*, 94-2575 (La. App. 4 Cir. 11/16/95), 665 So. 2d 133, 135, *writ denied*, 95-3008 (La. 2/16/96), 667 So. 2d 1053; *Smith v. Arcadian Corp.*, 95-97 (La. App. 3 Cir. 5/31/95), 657 So.2d 464, 467. CSI does not appear to dispute the first and third requirements above. Thus, the disposition of Defendants' motions depends entirely on whether the contract between CSI and Fire Windows was a construction contract or a sales contract.

Section 9:2772 applies only to contracts of construction, not to contracts of sale. *See Riley Stoker Corp. v. Fid. & Guar. Ins. Underwriters, Inc.*, 26 F.3d 581, 591 (5th Cir. 1994) (citing *DeWoody v. Citgo Petrol. Corp.*, 604 So.2d 92, 99 (La. Ct. App. 1992), *writ denied*, 605 So.2d 1369 (La. 1992), *writ denied*, 605 So.2d 1372 (La. 1992)). "[I]n determining whether a contract is a construction contract or a sales contract, Louisiana courts generally weigh the economics of the situation to determine whether the primary obligation is one 'to give' [sales contract] or 'to do' [construction contract]." *Harris v. Black Clawson Co.*, 961 F.2d 547, 553 (5th Cir. 1992) (citations omitted) (internal quotation marks omitted). Courts sometimes make this determination based on a three-factor test:

> First, in a contract to build, the "buyer" has some control over the specifications of the object. Second, the negotiations in a contract to build take place before the object is constructed. Third, and perhaps most importantly, a building contract contemplates not only that one party will supply the materials, but also that that party will furnish his skill and labor in order to build the desired object.

5

*Duhon v. Three Friends Homebuilders Corp.*, 396 So.2d 559, 561 (La. Ct. App. 1981). Additionally, "[u]nder the 'value test' the court determines whether the labor expended in constructing the item, or the materials incorporated therein, constitute the 'principal value of the contract.'" *Alonzo v. Chifici*, 526 So. 2d 237, 241 (La. Ct. App. 1988), *writ denied*, 527 So. 2d 307 (La. 1988). Courts may also pay particular attention to "the extent to which the manufacturer custom designed the product for the purchaser," *Summerfield*, 1998 WL 726080 at *4, or whether the product was merely "a stock item," *Poree*, 711 So.2d at 818-19. Nonetheless, the main inquiry is the nature of the primary obligation in the contract.

In this case, it is undisputed that Fire Windows did not install the windows it supplied to CSI. This fact is relevant to the peremption issue, but it is not dispositive. A contract that does not require installation can still consist mainly of an obligation "to do," rather than "to give." For example, in one Louisiana case involving an elevator, the court held that § 2772 applied in favor of the company that had performed the "design and engineering" of the elevator, even though the company had not performed the "construction, installation, or inspection" of the elevator. *Poree*, 711 So.2d at 819. The court concluded that the company was "primarily concerned with the contract to design," and was "not involved with the contract to install or sell the elevator." *Id.* Therefore, the Court concluded that § 2772 applied. *Id.*

In another case, the U.S. Court of Appeals for the Fifth Circuit held that § 2772 applied to a company that had contributed to the construction of a generator for a power plant, despite the fact that the company had done "little work at the site." *Riley Stoker Corp. v. Fid. & Guar. Ins. Underwriters, Inc.*, 26 F.3d 581, 591 (5th Cir. 1994). This fact alone, the court held, did not mean that the contract was a sales contract. *Id.* Thus, as a matter of law, the performance of

custom design and manufacturing can be sufficient to establish that a contract's primary

obligation is "to do" rather than "to give."

In this case, however, the parties dispute the extent to which Fire Windows customized

the windows it provided to CSI. Fire Windows asserts that it designed the windows based on

plans and specs it received from CSI, prepared shop drawings, and sent those drawings "up the

ladder" for approval, at which point Fire Windows made further modifications. Fire Windows

submits various evidence in support of these claims. First, it cites the Affidavit of James E.

Rother, who served as the President of Fire Windows at the time of the alleged design of the

windows. (Rec. Doc. 35-4). Mr. Rother claims to have been the primary person responsible for

the execution of the contract with CSI, including the design and construction of the windows. *Id.*

at ¶ 3. He asserts that Fire Windows did not build the windows in advance, but rather "had to

design the window systems based on the plans and specs" of CSI. *Id.* at ¶¶ 5-6. He also claims

that the windows "were unique systems designed and built specifically for the construction

project at issue." *Id.* at ¶ 8. Defendants also submit a list of detailed requirements for the

windows. (Rec. Doc. 35-5).

In addition, Defendants submit correspondence between Fire Windows and CSI, which

demonstrates that the parties sent drawings to one another over the course of several months.

(Rec. Doc. 35-6 at 1-3). In a letter to Fire Windows dated April 23, 2002, Conrad Appel from

CSI writes: "Enclosed is our check in the amount of $38,750.00 to begin fabrication of the fire

rated windows for the above reference [*sic*] product." *Id.* at 4. In a fax to CSI dated April 25,

2002, Mr. Rother responds: "I am ready to place the parts into productions [*sic*] but I noticed our

shop drawings are not signed off as 'approved for fabrication.'" *Id.* at 5. In a letter to Fire

Windows dated April 24, 2002, but apparently faxed on April 26, 2002, CSI writes: "Attached are the approved shop drawings [you requested] to start production on the fire rated windows." *Id.* at 8.

CSI argues that Fire Windows did not custom design the window systems for CSI, but rather supplied standard windows and merely adjusted their dimensions based on the requirements of the project. In other words, CSI claims, on information and belief, that "Fire Windows' windows were already pre-designed and all they had to do was scale the windows to the appropriate dimensions needed by the customer." (Rec. Doc. 41 at 3). CSI asserts that discovery on this issue is still ongoing, and argues that summary judgment is premature for this reason.

CSI also submits some limited evidence on this issue. First, it includes the Bid Proposal that Fire Windows submitted to CSI (Rec. Doc. 41-2), which, according to CSI, shows that Fire Windows assumed "no design, construction or installation obligations" (Rec. Doc. 41 at 2). The Bid Proposal quotes a price based on the number and type of windows, although, as Defendants point out, the "Payment Terms" state: "Due to the specialized nature of this product we require 50% down payment to release your order to production." (Rec. Doc. 41-2 at 1).

Second, CSI submits the affidavit of Conrad Appel, III, the President of CSI. (Rec. Doc. 41-5). Mr. Appel asserts that he has personal knowledge of the facts because he "was personally involved, though ConstructionSouth, Inc., in constructing the relevant Welcome Center building." *Id.* at ¶ 4. His affidavit states that the contract between CSI and Fire Windows "acknowledges that the material, i.e. windows, supplied would be subject to sales tax," that the architect (rather than Fire Windows) bore responsibility for designing the windows, that Fire

Windows "supplied standard fire-rated hollowed frame steel windows," and that the only

"unique" aspect of the windows was their dimensions, which the architect actually determined.

*Id.* at ¶¶ 12-17.

The extent to which Fire Windows designed the windows it supplied to CSI is a vital

issue with respect to whether peremption applies in this case. In fact, whether CSI's claims are

perempted appears to depend entirely on whether Fire Windows designed the windows. In one of

the few prior § 2772 cases involving windows, a Louisiana court held that a contract was one of

construction, rather than sale, because "[i]nstallation was more than a trifling part of the

agreement" and in addition, "the contract required fabrication in accordance with defendant's

construction plans and specifications." *PPG Indus., Inc. v. Schega*, 362 So.2d 1128 (La. Ct. App.

1978); *see also Harris*, 961 F.2d at 553 (holding that peremption applied to large hydrapulper

tub constructed onsite by necessity, since, "given the size of the tub and the fact that it is

embedded in the building," installation provision of the contract was not "merely incidental to

the tub's sale"); *cf. DeWoody v. Citgo Petroleum Corp.*, 604 So.2d 92, 99-100 (La. Ct. App.

1992) (holding manufacturer of motor starter not entitled to peremption because manufacturer

was not a contractor, and had not entered into a contract to build).

More recently, the Fifth Circuit has noted the importance of the distinction between a

contract for the purchase and installation of a large, elaborate, custom-designed item and

"purchase and installation contracts concerning smaller, more standardized products which can

be constructed elsewhere and installed later, such as air conditioners, glass windows and doors,

awnings, and the like." *Harris*, 961 F.2d at 553 (citing *KSLA-TV v. Radio Corp. of Am.*, 501 F.

Supp. 891, 894 (W.D. La. 1990), *aff'd*, 693 F.2d 544 (5th Cir. 1982) (per curiam)); *see also*

*Jones v. Crane Co.*, 26,781 (La. App. 2 Cir. 4/5/95), 653 So.2d 822, 827 (holding that § 2772 did not apply, in part because defendant did not install central heating unit, and unit did not appear to be "designed or manufactured specifically for this particular house"). In the latter type of case, the Fifth Circuit explained, "[t]he value of the obligation to install the equipment is minimal compared to the value of the equipment itself." *Id.*

In yet another recent case, the Fifth Circuit held that the defendant's provision of one of several standard models of ozone generators, selected based on the specific needs of the co-defendant that bought the equipment, was not enough to bring the case within the scope of § 2772. *Swope v. Colombian Chemicals Co.*, 281 F.3d 185, 204 (5th Cir. 2002). The court noted that "nothing in the record specifie[d] any modifications in model structure, characteristics, or capabilities . . . in connection with the sale and delivery of the generators." *Id.* at 205; *see also Harvey v. Mosaic Fertilizer, LLC*, No. 06-9510, 2009 WL 3112144, at *4 (E.D. La. Sept. 25, 2009) (holding that § 2772 did not apply where manufacturer did not install heat exchanger, and heat exchanger itself "was a duplicate of one made by another manufacturer who was responsible for the engineering of the design"). As a result, the *Swope* Court held that the defendant had "performed an obligation to give, i.e., sale of the equipment, to the obligee" and "the independent building contractor [had] performed the obligation to do." *Id.* This was true even if the defendant had performed "incidental services" in connection with the sale; any obligation to do was "de minimis in comparison with the obligation to give or sell the generators." *Id.*; *see also Tidewater, Inc. v. Baldwin-Lima Hamilton Corp.*, 410 So.2d 355, 357 (La. Ct. App. 1982) (defendant that acquired crane from manufacturer, then sold crane to plaintiff, performed primarily under obligation to give, not obligation to do, despite provision of

10

some services in association with sale of crane).

In the instant case, it is undisputed that Fire Windows had *no* obligation to install the windows it manufactured. Therefore, if CSI is correct, and Fire Windows' obligation to supply the windows was merely "the sale of an off-the-shelf product," then the Court will be forced to conclude that Fire Windows' role under the contract was "primarily an obligation to give." *Summerfield*, 2009 WL 726080 at *4.[2] Conversely, if Fire Windows did customize the windows to a significant extent, then Fire Windows primarily performed an obligation "to do," and CSI's claims against all three Defendants are perempted.

The outcome of the peremption issue thus depends on a factual issue: the extent to which Fire Windows designed the window systems. The parties have submitted conflicting evidence on that issue, including two largely conflicting affidavits. In order to grant summary judgment to Fire Windows at this point in the case, the Court would have to weigh those affidavits against one another and make credibility determinations, which would be inappropriate on summary judgment. Even more importantly, discovery in this case is still underway, and as a result, the factual record is still being developed. For this reason, the Court agrees with CSI that Defendants' motions are premature at this time. CSI is entitled to additional information about Fire Windows' work in order to defend against Defendants' motions.

Accordingly, the Court will deny summary judgment to Defendants without prejudice. Defendants may refile their motion at the close of discovery, at which time both parties may

---

[2] Furthermore, the record suggests that CSI was required to pay sales tax for the windows, which is yet another factor weighing in favor of concluding that the contract was one of sale. *Tenneco Oil Co. v. Chicago Bridge & Iron Co.*, 495 So.2d 1317, 1322 (La. Ct. App. 1986); *see also Harvey*, 2009 WL 3112144, at *4.

11

supplement their briefs with any additional evidence in their possession. Because the parties have thoroughly briefed the legal issues, additional legal briefs likely will not be required. Defendants may simply refile their motion with any new evidentiary support, and Plaintiff may respond by doing the same.

## IV.    CONCLUSION

For the foregoing reasons, IT IS ORDERED that Defendants' motions (Rec. Docs. 35, 36, 38) are DENIED WITHOUT PREJUDICE. Defendants may refile their motions, and the parties may supplement their briefs, with additional evidence after discovery in this case is complete.

New Orleans, Louisiana this 24th day of June, 2013.

UNITED STATES DISTRICT JUDGE